# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA

**VERSUS**

MACON CARROLL

CRIMINAL ACTION

NO. 18-13-JWD-RLB

## RULING AND ORDER

This matter comes before the Court on *Defendant's Motion to Suppress* (Docs. 19) filed by Macon Carroll.  The Government opposes the motion. (Doc. 21.)  On August 20, 2018, a hearing was held on the Defendant's motion. (Doc. 37.)  The parties then submitted post-hearing briefs (Docs. 55–59), and the Defendant filed a reply memorandum (Doc. 61).  Further argument is not necessary.  The Court has carefully considered the law, the facts in the record, and arguments and submissions of the parties and is prepared to rule.  For the following reasons, Defendant's motion is denied.

## I.     Relevant Background

### A.  Overview

This case arises out of an incident occurring between Defendant and certain law enforcement officers near the intersection of Denham Road and Greenwell Springs Road on the afternoon of September 17, 2017. (Hr'g Tr., 5, 43, Aug. 20, 2018, Doc. 44; U.S. Ex. 4.)  Specifically, on that day, Deputy David Carter and Corporal Andrew Woodruff were traveling in separate vehicles eastbound on Denham Road toward Greenwell Springs Road when they were flagged down by a motorist in a white pickup truck traveling in the westbound lane. (Hr'g Tr., 7–9, 43–44, 60.)  According to Woodruff, a male and female were standing next to the truck's driver's side window and appeared to be in "some type of distress."  (Hr'g Tr., 43–45.)  Carter

testified that he was told by the motorist in the truck that the two on foot, who were walking toward him in the eastbound lane, needed "some help" and had been on the motorist's property. (Hr'g Tr., 7–9, 22, 26.) At that time, the two people—the Defendant and his girlfriend, Brittany Shenetiker—came up to Carter's passenger-side window, and Carter made contact. (Hr'g Tr., 9, 19.)[1]

Defendant's initial encounter with the officers is the subject of this motion. The encounter culminated with Corporal Woodruff handcuffing Defendant, searching his bag, finding a short-barreled rifle, and then arresting Defendant for having that rifle. (U.S. Ex. 1A, 4:50–8:03.) Defendant was later indicted in this Court by a federal grand jury on one count of possessing a firearm as a convicted felon in violation of 18 U.S.C. § 922(g). (Doc. 1.)

As will be explored below, the crux of this motion is whether Defendant's initial encounter with law enforcement was consensual. The details from the encounter come primarily from the testimony developed at the suppression hearing and a dash cam recording from Woodruff's vehicle. The video shows most of the encounter with the Defendant, and there is audio for all but the first minute. [2] As a general matter, the Court listened to the testimony of the officers and observed their demeanor on the stand, and the Court found them highly credible. The following sections are taken from this evidence and are a summary of the events leading up to the Defendant's handcuffing.

---

[1] While Defendant elicited testimony at the hearing that Woodruff's report omitted the motorist and Carter and that the video did not show the encounter with the motorist (Hr'g Tr., 62–64), the Court nonetheless found the officers' testimony on these points believable.

[2] Woodruff was asked why some of the encounter was not recorded on video or with audio. As to the video, he stated that he activated his lapel for recording "as soon as [he] step[ped] out of the car." (Hr'g Tr., 59.) For the audio, Woodruff testified that he couldn't answer why there was no recording for the first minute and that this was a question for the "computer people." (Hr'g Tr., 58–59.) He said that there was a "technical problem on the first minute of not having audio." (Hr'g Tr., 60.) The Court notes again that it found Woodruff's explanation believable.

## B. Beginning of the Video

The beginning of the video has the Defendant and Shenetiker talking to Deputy Carter in his police SUV, which is parked in the lane of traffic. (U.S. Ex. 1A, 0:00–0:23; Hr'g Tr., 25–26.) Deputy Woodruff's vehicle is parked behind Carter's, partly on the shoulder and partly in the road. (U.S. Ex. 1A, 0:00–0:23; Hr'g Tr., 25–26.) Woodruff is positioned behind Carter' vehicle, in between the two vehicles and facing the Defendant, and Woodruff's hand is positioned near his firearm; however, the firearm is not drawn. (U.S. Ex. 1A, 0:00–0:23.)[3]

Deputy Carter stated that he asked where the Defendant and Shenetiker came from, where they were going, and where they lived. (Hr'g Tr., 12–13; U.S. Ex. 1A, 0:00–0:23.) Woodruff testified that Defendant and his girlfriend were free to leave and ignore the questions, but he did not hear Carter tell Defendant that. (Hr'g Tr., 71.)

Woodruff also testified that, had the Defendant and his girlfriend continued walking, they probably would have walked in the path of Woodruff's vehicle. (Hr'g Tr., 67.) But, as Carter testified, "They can still go around our units." (Hr'g Tr., 32.)[4]

The video also shows that Carter's emergency lights were activated during this time. (U.S. Ex. 1A, 0:00–0:59.) Woodruff testified that he activated his rear hazard lights as well. (Hr'g Tr., 45; *see also id.*, 32.) Carter stated that his lights are activated when he's on the side of the road "usually to let oncoming traffic know that we are stopped and have an emergency situation." (Hr'g Tr., 40–41.) "Even if [Carter is] not in an emergency situation," activating the lights contributes to the safety of the officers and other vehicles. (Hr'g Tr., 41.) Regarding Carter's lights, Woodruff testified: "He doesn't have his front wigwags, and he doesn't have the

---

[3] According to Carter, this is the position the officers always use, and, according to Woodruff, is "a standard thing" because he did not "know[] these people yet" or "really what's going on." (Hr'g Tr., 27–28, 48.)
[4] While not a basis for the Court's decision, it is worth noting that Defense counsel even said in questioning Woodruff, "Of course they could walk around your car, I understand your point." (Hr'g Tr., 68.)

whole thing on. He just has the rear indicator that: hey, we're stopped. Go around us." (Hr'g Tr., 70; *see id.* 71.) "It's a highway. To let people know there's a stopped car ahead[.]" (Hr'g Tr., 70.)

### C. Defendant Reaches for his Machete

The video next shows the Defendant turn and reveal a "machete along [his] side, which was clipped to his backpack." (Hr'g Tr., 14; U.S. Ex. 1A, 0:23.) Defendant appeared to reach for the machete. (Hr'g Tr., 14; U.S. Ex. 1A, 0:23.) Woodruff said he "must have said [to Defendant]: Hey is that -- what's that? Or what are you carrying there? And he turns and he puts his hand on it." (Hr'g Tr., 72.)

On the video, Woodruff backs off camera at this point, and the Defendant and Shenetiker raise their hands. (U.S. Ex. 1A, 0:23–0:27.) According to Carter, Woodruff advised Defendant "to keep his hands away from the machete." (Hr'g Tr., 14; U.S. Ex. 1A, 0:23–0:59.) Woodruff testified that he told Defendant, "Don't touch it. Leave it alone," and he did so for "officer safety." (Hr'g Tr., 47–48.)

Carter also testified that Woodruff had his hand on his weapon. (Hr'g Tr., 29.) Woodruff testified that he did not pull his weapon from the holster. (Hr'g Tr., 73.) Woodruff said he depressed and opened the holster's hood (which unlocks the firearm from the holster) and then put the hood back over the top of his firearm. (Hr'g Tr., 73.) Defendant said, "Sorry." (Hr'g Tr., 74.)

### D. Woodruff's Gesture and Defendant's Raising of His Hands

Thereafter, the video shows Carter get out of his vehicle and join Woodruff in the rear of the vehicle. (U.S. Ex. 1A, 0:23–0:59.) Carter testified that, around the 0:48 mark, Woodruff

called in what was happening and said that they were with "two subjects on the side of the road on Denham Road." (Hr'g Tr., 30.)[5]

After continuing to talk, around the 0:59 mark of the video, Woodruff gestures toward the Defendant and Shenetiker with his hand, and they raise their hands and then put their hands on their head. (U.S. Ex. 1A, 0:23–0:59.) Carter did not remember exactly what was said, though he testified that it looked like Woodruff "motion[ed] with his left hand to stay there." (Hr'g Tr., 31–32.)

However, as Carter testified, the officers did not direct Defendant to put their hands up. (Hr'g Tr., 15–16, U.S. Ex. 1A, 0:59.) Woodruff agreed: "They did that on their own. I never told them to put their hands on top of their head or stand like that. So I don't know why they're doing that. That's unusual for me to see somebody do that." (Hr'g Tr., 77.)

Of these parts of the video, Woodruff stated that he asked Defendant if he had some sort of identification, and Defendant replied "no, he left it at home." (Hr'g Tr., 49.) As to his gesture, Woodruff testified that he "believe[d] he asked [Defendant]: 'Stay here. I'll be right back.'" (Hr'g Tr., 75.) He continued: "It's not ordering him to stay there. I said: Hey, if you could just stand right here, I'll be right back. . . . He's still free to leave at this point. I'm not ordering him to remain there. I'm just saying: 'Stay here. Don't run out into the street. Be right back.'" (Hr'g Tr., 75.) Woodruff further testified:

> Q: So stay here. That means you're not free to leave, right?
>
> A: No. He's still free to go. He's still not being detained for any crime. . . . He has not asked me to leave yet. He has not asked me: Am I under arrest? Am I being detained? Am I free to leave? He did not make any of those comments, no.
>
> Q: So he has to ask you permission to leave?

---

[5] By "subject," Carter simply meant, "anybody [he] [doesn't] know." (Hr'g Tr., 41.)

A:      If he wants to leave.

Q:      So if he wants to leave, he needs your permission?

A:      If he wants to leave he can go.  But he never indicated to me that he wanted
        to go.

(Hr'g Tr., 76.)

### E.  Woodruff Asks for Identification and Runs a Background Check

Woodruff returns to his vehicle, and, at this point in the video, there is audio. (U.S. Ex. 1A, 0:59–1:00.)  Woodruff returns with a pad, and the officer asks the two their names and dates of birth. (U.S. Ex. 1A, 1:00–2:00.)  Woodruff asked for this information so that he could run a warrant check. (Hr'g Tr., 17, 49–50.) Woodruff then returned to his vehicle. (U.S. Ex. 1A 2:00–2:15).

Thereafter, Carter, Defendant, and Shenetiker remain outside the vehicles. (U.S. Ex. 1A, 2:15–4:54.)  At about the 3:12 mark, Defendant and Shenetiker sit down, and Defendant later gets up as he talks to Carter. (U.S. Ex. 1A, 3:15.)

Carter testified that, from 0:59 to the 4:54 mark, Defendant and Shenetiker did not ask to leave, did not try to leave, and were cooperative. (Hr'g Tr., 16–17.)  Woodruff said the same. (Hr'g Tr., 50.)

Woodruff was questioned at the hearing, "If you asked somebody for their name and date of birth and they give it to you and walk off, can you stop them?", and he replied, "They're free to go at this point, so if they didn't want to give me any information, they're free to go."  (Hr'g Tr., 50.)  Woodruff said later that Defendant "could have refused" to give identification and said, "I don't want to tell you[.] . . . They're still free to go [while he does a warrant check].  This whole time, they're free to go." (Hr'g Tr., 79.)

Of Carter's position while Woodruff runs the background check, Woodruff said: Defendant is "still armed with the machete and the other knife he has . . . on his side. David Carter is just taking an interview stance. He's not restricting their movement at all. He's not blocking them from leaving or restricting their movement at all. He's taking an interview stance." (Hr'g Tr., 79–80.)

Woodruff said it is "standard practice to get their information and run them for warrants" in these consensual encounters. (Hr'g Tr., 80.) Woodruff acknowledged, however, that he never told Defendant and his girlfriend that they were free to go or that they did not have to provide information to them. (Hr'g Tr., 80.) But Woodruff further said, "They're not boxed in. I mean, there's room for them to leave between the two cars and go around and go the other way[.]" (Hr'g Tr., 81.)

### F. Woodruff Asks About Weapons and Handcuffs Defendant

At the 4:54 second mark, Woodruff returns on camera (with black gloves on) and states, "You don't have any guns or . . ." (U.S. Ex. 1A, 4:54–5:03.) Before he can finish, Defendant points to his backpack, says, "I have a .22 in the bag." (U.S. Ex. 1A, 5:00–5:06.) Woodruff then asks, "Do you have a conceal carry permit for that?"; Defendant pauses and then says, "A what?" (U.S. Ex. 1A, 5:00–5:06.) Woodruff asks again, "Do you have a concealed handgun license to have a gun in your backpack?" Woodruff pauses, and, at that point, Woodruff says he is detaining the Defendant and proceeds to frisk him. (U.S. Ex. 1A, 5:06–5:24.)

Carter testified that, until Defendant said he had a .22 in his bag, Defendant was "free to leave." (Hr'g Tr., 34, 40.) Carter was not investigating Defendant for any other crime. (Hr'g Tr., 34–35.)

Woodruff testified to the following:

Q:     Corporal, you exit your vehicle and you ask Mr. Carroll if he had any weapons?

A:     Correct.

Q:     Why?

A:     I was ready to let them go at that point.  I was satisfied with who they were and that, you know, they weren't up to anything other than, you know, walking down the street.  I was ready to let them go at that point.  I routinely ask people if they have any guns, knives, hang grenades, explosive devises on them.  It's just a routine that I go through before I let somebody go, just to make sure that nothing else is afoot.

Q:     You said "Let them go," were they detained prior to this –

A:     I'm saying let them go as: Here's your information back. Have a nice day.

Q:     But you intended to terminate your encounter?

A:     Correct.

(Hr'g Tr., 52.)  Woodruff later said:

Q:     So you're coming out to tell them and to - - your words were to release them, right?

A:     Correct.

Q:     So you're releasing them from being detained by you so they can go on with their life because you didn't find a warrant, right?

A:     Correct.

(Hr'g Tr., 81–82.)

Woodruff also stated the following about the gloves:

Q:     So when you got out of the car, you knew you were going to search his bag, didn't you?

A:     No, I did not.

Q:     Because when you were in the car you put your searching gloves on?

A:     That's correct.

Q:     Right. Because you were going to get out and see if there were any guns in that bag?

A:     What I was planning to do was I was letting them go and I wanted to make sure that he did not have any guns or drugs or anything else on him at that point before I let him go.

Q:     Before you let him go, you were going make sure he didn't have any guns or drugs or anything on him; is that right?

A:     Sure.

(Hr'g Tr., 82–83.)  Woodruff continued:

Q:     If Mr. Carroll had not told you that he had a weapon in his bag, you couldn't have searched the bag, could you?

A:     That is correct.

Q:     If he had said – if you asked: Do you have any guns and he said no, what would have happened next?

A:     My next question to him would be: Have a nice day.  Because I was – they were – I was ending my encounter with them at this point.  So if I said, do you have any guns? And he said: Nope. And I'd of said: okay. Have a nice day. I'm done.

(Hr'g Tr., 84.)  Woodruff put his gloves on "in case [he] had to search him or search his person" and because, when he searches people, it raises concerns for things like "knives, needles, razor blades, broken crack pipes." (Hr'g Tr., 84–85.)

After Defendant replied "What?" to Woodruff's question about a concealed handgun permit, Woodruff had suspicion that a crime was occurring at that point. (Hr'g Tr., 44 at 52.) Woodruff also said Defendant consented to a search of his bag. (Hr'g Tr., 85.)  During Woodruff's search of the bag, Woodruff found a short-barrel rifle. (U.S. Ex. 1A, 6:58–7:12.)

## II.    Parties' Arguments

### A.  Preliminary Note

Both parties maintain that the heart of this motion is whether the encounter between the officers and Defendant was consensual.  The Government stated in oral argument, "I think the Defense and the Government are in agreement on what the central legal issue here is, and that is whether or not this was a consensual encounter until Corporal Woodruff asked [Defendant] if he had any guns." (Hr'g Tr., 93.)  The Defendant similarly writes in briefing, "The question for this Court is whether Mr. Carroll chose to interact with Dep. Carter and Cpl. Woodruff such that this was a consensual encounter, or whether, through their actions, Dep. Carter and Cpl. Woodruff created a sufficiently coercive roadside environment such that a reasonable person would not feel free to leave." (Doc. 61 at 1.)

The Court agrees with the parties that this is the central issue.  This is because "statements given during a period of illegal detention are inadmissible even though voluntarily given if they are the product of the illegal detention and not the result of an independent act of free will." *Florida v. Royer*, 460 U.S. 491, 501, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983) (citing *Dunaway v. New York*, 442 U.S. 200, 218–19, 99 S. Ct. 2248, 60 L. Ed. 2d 824 (1979); *Brown v. Illinois*, 422 U.S. 590, 601–02, 95 S. Ct. 2254, 45 L. Ed. 2d 416 (1975)).  Thus, if Defendant's detention was not consensual, all of the evidence derived from what followed would likely be suppressed as fruit of the poisonous tree. *See Wong Sun v. United States*, 371 U.S. 471, 488, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963) (the test for the fruit of the poisonous tree doctrine is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means

sufficiently distinguishable to be purged of the primary taint."). Accordingly, the Court will focus its attention solely on this question.[6]

### B. Defendant's Post-Hearing Briefing (Doc. 59)

Defendant urges in post-hearing briefing that all evidence taken from the Defendant should be suppressed. Defendant argues that the "roadside environment created by Deputy Carter and Corporal Woodruff would have made a reasonable person feel they were not free to leave." (Doc. 59 at 6.)

According to Defendant, neither the officer's subjective intent nor the Defendant's subjective perception is relevant to the analysis, as the standard is objective. (Doc. 59 at 7–8.) Thus, the officers' opinions about the encounter and experience and the Defendant's criminal history are irrelevant.

Defendant focuses on several specific facts. First, Defendant emphasizes the fact that the officers "activate[d] their emergency lights and blocked the roadway and walkway with their vehicles . . . thereby physically impeding [Defendant's] movement." (Doc. 59 at 8.) According to Defendant, the "activation of emergency lights by a law enforcement officer is a show of authority compelling compliance." (Doc. 59 at 9 (citation omitted).) Further, the "two armed, uniformed law enforcement officers" blocking Defendant's pathway was also coercive, and the officer's subjective intent is irrelevant. (Doc. 59 at 9.)

Defendant next stresses the facts that Woodruff kept his hand on his firearm, "gestured aggressively," and "employed language and a tone of voice that commanded compliance," such

---

[6] Specifically, the Government argues in post-hearing briefing that, even if the encounter was not consensual, the officers had reasonable suspicion to conduct the search. (Doc. 56 at 6–8.) However, as the Defendant correctly argues, the attorney for the government conceded at the hearing that the officers acknowledged that they lacked reasonable suspicion or probable cause to open Defendant's bag without Defendant's admission about the gun. (Hr'g Tr., 94.) Thus, the Court will not address the Government's alternative argument.

as "don't touch that" and "Stay here." (Doc. 59 at 10.)  Defendant also highlight's Woodruff's

hand gestures, which he argues "compels compliance. . . . This was not a request—this was an

order." (Doc. 59 at 11.)

Additionally, officers detained the Defendant to run a background check, and this

constitutes a seizure under the Fourth Amendment.  "A reasonable person would understand Cpl.

Woodroof's action of returning to his vehicle to run a warrants check to mean that he was not

free to leave until the completion of the investigation (i.e., the outcome of the warrants check

was revealed.)."  (Doc. 59 at 11.)

Further, Woodruff's approaching the defendant with black searching gloves also

"fundamentally altered the nature of the encounter with Mr. Carroll." (Doc. 59 at 12.)  "By

putting on the gloves, Cpl. Wood[ruff] communicated to Mr. Carroll that a search was going to

take place and 'clearly asserted his authority as a peace officer to seize [Mr. Carroll] so that any

reasonable person in [Mr. Carroll's] position would have known that he had been detained at that

moment and was no longer free to walk away." (Doc. 59 at 12 (citation omitted).)  Defendant

analyzes this case to *United States v. Monsivais*, 848 F.3d 353, 358 (5th Cir. 2017), where an

officer announced he was going to pat down an individual; similarly, the search gloves

announced to Defendant that he was going to be searched.

Defendant also emphasizes Woodruff's testimony that he wanted to search Defendant

"before [Woodruff] let him go".  Woodruff further said Defendant had to ask "permission" to

leave "if he wants to leave". (Doc. 59 at 13.)  Woodruff stated that he was "releasing them from

being detained . . . so they can go on with their life because you didn't find a warrant". (Doc. 59

at 13.)  While the officers had no obligation to inform Defendant of his ability to leave, "their

decision not to acknowledge his ability to leave had the effect of conveying to a reasonable person that he was not free to walk away." (Doc. 59 at 14.)

Defendant concludes: "Despite the good intentions and professionalism of Dep. Carter and Cpl. Woodroof, the testimony from the evidentiary hearing and the dash camera video demonstrate that Mr. Carroll's seizure was an investigatory detention triggering a reasonable suspicion analysis under the Fourth Amendment." (Doc. 59 at 14.)

### C.  Government's Post-Hearing Brief (Doc. 56)

The Government maintains that this is a "classic example of a consensual encounter and does not implicate the Fourth Amendment." (Doc. 56 at 4 (citation omitted).)  According to the Government, the officers only asked questions and for identification, and, because Defendant had none, it "necessitated getting their names and dates of birth, returning to the car and radioing dispatch to run a warrant check." (Doc. 56 at 4.)  Woodruff emerged and asked if Defendant had any guns in his possession, and Woodruff searched only after receiving a positive answer. (Doc. 56 at 4.)  The Government asserts: "All of the deputy's actions during the consensual encounter are permitted." (Doc. 56 at 4–5.)

The Government also contends that their vehicle's positioning and the fact that two officers were present does not mean that the encounter was not consensual.  The Government focuses on the fact that the video shows that the officers were polite and not coercive and that the Defendant and Shenetiker were cooperative (so much so that Defendant truthfully answered Woodruff's question about having firearms).

The Government concludes: "Any reasonable person in Mr. Carroll's situation would know they were free to walk away from the deputies when they approached him or at any time

during the encounter.  Until his voluntary disclosure, Carroll was never seized within the meaning of the Fourth Amendment." (Doc. 56 at 5.)

### D.  Defendant's Reply (Doc. 61)

Defendant's reply summarizes much of the argument in his main post-hearing brief. Again, Defendant contends that this is not a "classic encounter," which is " 'merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen.' " (Doc. 61 at 1 (quoting *Florida v. Royer*, 460 U.S. at 497).)  Rather, the video and transcript show that the officers "physically stopped Mr. Carroll, blocked his path impeding his forward movement, displayed a weapon, issued commands, ran his identification, and delivered orders leaving Mr. Carroll no choice but to interact with the officers." (Doc. 61 at 2.)

Defendant maintains that the key question of whether there was a seizure is coercion rather than voluntary compliance, and " '[c]oercion' on the part of officers during a seizure simply means showing their authority in a manner which obtains compliance of the citizen." (Doc. 61 at 2 (citation omitted).)  As the Supreme Court has suggested, "the elements of a coercive encounter sufficient to render it a seizure *may* include an application of force, intimidating movement, an overwhelming show of force, brandishing weapons, blocking exits, threats, commands, or even an authoritative tone of voice." (Doc. 61 at 2 (citing *United States v. Drayton*, 536 U.S. 194, 204, 122 S. Ct. 2105, 153 L. Ed. 2d 242 (2002)).)

 Defendant contends that "almost all of the coercion elements are present and weigh in favor of finding that Mr. Carroll was seized." (Doc. 61 at 2.)  Defendant continues: "Dep. Carter and Cpl. Woodruff stopped Mr. Carroll and Ms. Shenetiker on the side of the road, activated their emergency lights, blocked Mr. Carroll's course by parking their vehicles in the walkway,

displayed a service weapon, performed a warrants check, and physically ordered Mr. Carroll to stay in a manner that compelled compliance." (Doc. 61 at 2–3.)

Defendant then focuses on Woodruff's instruction to "stay", which Defendant describes as an "order." Defendant concludes: "An order from a law enforcement officer with his hand on his gun and in uniform to 'stay here' compels compliance and conveys to the reasonable person they are not free to leave the encounter." (Doc. 61 at 3.)

## III. Discussion

### A. Relevant Standard

The Fourth Amendment provides in relevant part that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]" *United States v. Cardenas*, 9 F.3d 1139, 1147 (5th Cir. 1993) (quoting U.S. Const. amend. IV). "[T]he Supreme Court has determined that warrantless searches and seizures are per se unreasonable unless they fall within a few narrowly defined exceptions." *Cardenas*, 9 F.3d at 1147 (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 454–55, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971)). The government bears the burden of justifying a warrantless search. *United States v. Chavis*, 48 F.3d 871, 872 (5th Cir. 1995) (per curiam).

"The law regarding the seizure of persons is well developed." *United States v. Mask*, 330 F.3d 330, 336 (5th Cir. 2003) (collecting case). "Not all encounters between law enforcement officers and citizens are seizures for purposes of the Fourth Amendment." *Mask*, 330 F.3d at 336 (citing *Terry v. Ohio*, 392 U.S. 1, 19, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)).

"There are three recognized types of encounters between law enforcement officers and citizens, including: 1) a consensual encounter during which an individual voluntarily agrees to communicate with the police; 2) a limited investigatory stop based upon less than probable

cause; and 3) an arrest which constitutes a seizure under the Fourth Amendment." *United States v. Williams*, 365 F.3d 399, 403–04 (5th Cir. 2004) (citing *United States v. Cooper*, 43 F.3d 140, 145–46 (5th Cir. 1995)). "A voluntary encounter between an officer and a citizen may ripen into a seizure, triggering the Fourth Amendment and requiring officers to be able to articulate reasonable suspicion or probable cause, 'only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of [the] citizen.' " *Mask*, 330 F.3d at 336 (quoting *Terry*, 392 U.S. at 19).

The Government has the burden of proving that an encounter was consensual rather than coercive. *United States v. Mendenhall*, 446 U.S. 544, 557, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 222, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973)); *Florida v. Royer*, 460 U.S. 491, 497, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983) (collecting cases). "In deciding if an encounter between the police and a private citizen is consensual, the district court must determine if a reasonable person in the circumstances described would feel free to disregard the officers and proceed with his or her own business." *Williams*, 365 F.3d at 404 (citing *Florida v. Bostick*, 501 U.S. 429, 434, 111 S. Ct. 2382, 115 L. Ed. 2d 389 (1991)); *see also Mask*, 330 F.3d at 336 ("The test provides that an individual has been seized for Fourth Amendment purposes 'only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.' " (quoting *Mendenhall*, 446 U.S. at 554; *INS v. Delgado*, 466 U.S. 210, 215, 104 S. Ct. 1758, 80 L. Ed. 2d 247 (1984)).

"The test for whether a seizure occurred is necessarily imprecise because it seeks to measure the coercive effect of police conduct when viewed as a whole." *Mask*, 330 F.3d at 337 (citing *Michigan v. Chesternut*, 486 U.S. 567, 573, 108 S. Ct. 1975, 100 L. Ed. 2d 565 (1988)).

"[W]hat constitutes a restraint on liberty prompting a person to conclude that he is not free to 'leave' will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs." *Chesternut*, 486 U.S. at 573–74 (citing *Mendenhall*, *supra*; *Delgado*, *supra*).  The Court should "eschew[] focusing on the particular details of that conduct in isolation," *Mask*, 330 F.3d at 337, and instead look at the " 'totality of the circumstances,' " *Williams*, 365 F.3d at 404 (quoting *United States v. Drayton*, 536 U.S. 194, 204, 122 S. Ct. 2105, 153 L. Ed. 2d 242 (2002)).  However, there are "several non-exclusive considerations that may argue in favor of a determination that the defendant had been seized: (1) the threatening presence of several officers; (2) the display of a weapon by an officer; (3) physical touching of the person of the citizen; and (4) the use of language or tone of voice indicating that compliance with an officer's request might be compelled." *Mask*, 330 F.3d at 337 (citing *Mendenhall*, 446 U.S. at 554).

Nevertheless, "[w]hile the test is flexible enough to be applied to the whole range of police conduct in an equally broad range of settings, it calls for consistent application from one police encounter to the next, regardless of the particular individual's response to the actions of the police." *Chesternut*, 486 U.S. at 574.  "This 'reasonable person' standard is objective, and is concerned not with the citizen's subjective perception or the officers' subjective intent, but only with what the officers' words and actions would have conveyed to a reasonable and innocent person." *Mask*, 330 F.3d at 336 (citing *Chesternut*, 486 U.S. at 574, 576 n. 7).  "The test's objective standard . . . allows the police to determine in advance whether the conduct completed will implicate the Fourth Amendment." *Chesternut*, 486 U.S. at 574 (citation omitted).

"[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing

to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions." *Florida v. Royer*, 460 U.S. at 497 (citing *Dunaway v. New York*, 442 U.S. 200, 210 n. 12, 99 S. Ct. 2248, 60 L. Ed. 2d 824 (1979); *Terry*, 392 U.S. at 31, 32–33 (Harlan, J., concurring); *id.*, at 34 (White, J., concurring); *see also Mendenhall*, 446 U.S. at 553 (Opinion of Stewart, J.) ("[T]here is nothing in the Constitution which prevents a policeman from addressing questions to anyone on the streets." (quoting *Terry*, 392 U.S. at 34 (White, J., concurring)). "Police officers enjoy 'the liberty (again, possessed by every citizen) to address questions to other persons,' although 'ordinarily the person addressed has an equal right to ignore his interrogator and walk away.' " *Mendenhall*, 446 U.S. at 553 (Opinion of Stewart, J.) (quoting *Terry*, 392 U.S. at 31, 32–33 (Harlan, J., concurring)); *see also Royer*, 460 U.S. at 497 ("The person approached, however, need not answer any questions put to him; indeed, he may decline to listen to the questions at all and may go on his way." (citation omitted)). "Nor would the fact that the officer identifies himself as a police officer, without more, convert the encounter into a seizure requiring some level of objective justification." *Royer*, 460 U.S. at 497 (citing *Mendenhall*, 446 U.S. at 555 (Opinion Stewart, J.)). Thus, "[e]ven when law enforcement officers have no basis for suspecting a particular individual, they may pose questions, ask for identification, and request consent to search luggage—provided they do not induce cooperation by coercive means." *Drayton*, 536 U.S. at 200–01 (citing *Florida v. Bostick*, 501 U.S. at 434–35; *see also Williams*, 365 F.3d at 404 (citing *Drayton*, 536 U.S. at 200–01).[7]

---

[7] Justice Stewart's seminal opinion in *Mendenhall* provides the excellent policy reasons for the above rules. "The purpose of the Fourth Amendment is not to eliminate all contact between the police and the citizenry, but 'to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals.' " *Mendenhall*, 446 U.S. at 553–54 (Opinion of Stewart, J.) (quoting *United States v. Martinez-Fuerte*, 428 U.S. 543, 554, 96 S. Ct. 3074, 49 L. Ed. 2d 1116 (1976)). "As long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or

## B. Examples from Case Law

Several cases illustrate the above principles. In *Florida v. Royer*, the Supreme Court affirmed the finding of an unlawful seizure in an airport. *Id.*, 460 U.S. at 501. The Supreme Court explained:

> Asking for and examining [defendant's] ticket and his driver's license were no doubt permissible in themselves, but when the officers identified themselves as narcotics agents, told [defendant] that he was suspected of transporting narcotics, and asked him to accompany them to the police room, while retaining his ticket and driver's license and without indicating in any way that he was free to depart, [defendant] was effectively seized for the purposes of the Fourth Amendment. These circumstances surely amount to a show of official authority such that 'a reasonable person would have believed he was not free to leave.' [*Mendenhall*, 446 U.S. at 554 (Opinion of Stewart, J.)].

*Royer*, 460 U.S. at 501–02.

However, in finding that there was no seizure during a drug interdiction on a bus in *Drayton*, the Supreme Court found that there were "ample grounds" for the district court's conclusion that the officer's interaction with the defendant was " 'cooperative' " and that there was " 'nothing coercive [or] confrontational' about the encounter." *Drayton*, 536 U.S. at 204. The Supreme Court found: "There was no application of force, no intimidating movement, no overwhelming show of force, no brandishing of weapons, no blocking of exits, no threat, no command, not even an authoritative tone of voice.' " *Drayton*, 536 U.S. at 204. The Supreme

---

privacy as would under the Constitution require some particularized and objective justification." *Mendenhall*, 446 U.S. at 554 (Opinion of Stewart, J.).

"Moreover, characterizing every street encounter between a citizen and the police as a 'seizure,' while not enhancing any interest secured by the Fourth Amendment, would impose wholly unrealistic restrictions upon a wide variety of legitimate law enforcement practices." *Mendenhall*, 446 U.S. at 554 (Opinion of Stewart, J.). "The [Supreme] Court has on other occasions referred to the acknowledged need for police questioning as a tool in the effective enforcement of the criminal laws." *Mendenhall*, 446 U.S. at 554 (Opinion of Stewart, J.). "Without such investigation, those who were innocent might be falsely accused, those who were guilty might wholly escape prosecution, and many crimes would go unsolved. In short, the security of all would be diminished." *Mendenhall*, 446 U.S. at 554–54 (Opinion of Stewart, J.) (citations and quotations omitted).

Court concluded: "It is beyond question that had this encounter occurred on the street, it would be constitutional." *Drayton*, 536 U.S. at 204.

Similarly, in *Williams*, the Fifth Circuit affirmed the denial of a motion to suppress and, in doing so, found that an encounter with law enforcement at a bus terminal was consensual. *Id.*, 365 F.3d at 408. Defendant argued that, though he initially cooperated with the officers, "by the time he was escorted to and from the baggage handling area, separated from the other passengers, and repeatedly asked for consent to search his backpack, the questioning had become a non-consensual detention." *Williams*, 365 F.3d at 403. The appellate court rejected defendant's argument; finding *Drayton* directly on point, the Fifth Circuit emphasized the reasonable explanation for moving to the baggage handling area[8] and the facts (1) that defendant was "not subjected to a restrictive environment" at the baggage handling area; (2) that "[t]here [was] nothing coercive about [the officers'] questions" and that "the officers did not demand answers to their questions, leaving [defendant] free to decide whether to answer"; and (3) that the "officers . . . displayed no weapons, and by all accounts maintained a professional decorum." *Williams*, 365 F.3d at 404–05.

### C. Analysis

Having carefully considered the law and facts in the record, the Court finds that Defendant's motion should be denied. Looking at the *Mendenhall* factors, (1) the presence of the two officers here was in no way threatening; (2) no weapons were displayed; (3) there was absolutely no physical touching of Defendant's person prior to the handcuffing; and (4)

---

[8] The Fifth Circuit specifically referred to the "extreme noise near the buses [which] made it difficult to converse and would have made it necessary to yell, thus introducing an undesirable intensity to any conversation." *Williams*, 365 F.3d at 404.

Woodruff's language and tone were not such that "compliance with [his] request might be compelled." *Mask*, 330 F.3d at 337 (citing *Mendenhall*, 446 U.S. at 554).

Additionally, this case is much closer to those decisions finding a consensual encounter than those finding coercion. While, like *Royer*, the officers never advised Defendant of his ability to leave, unlike *Royer*, the officers did not retain any of the Defendant's possessions, such as a ticket, license, or luggage, which would have "effectively seized [Defendant] for purposes of the Fourth Amendment." *Royer*, 460 U.S. at 501–502. Indeed, the officers held on to nothing belonging to Defendant (not even his machete), which meant that Defendant's freedom to leave was in no way restricted.

Rather, as will be discussed in even greater detail below, the evidence shows that the encounter was consensual. As in *Drayton*, the encounter was " 'cooperative,' " and there was " 'nothing coercive [or] confrontational' " about it. *Drayton*, 536 U.S. at 204. Further, as in *Drayton*, and contrary to Defendant's arguments, "[t]here was no application of force, no intimidating movement, no overwhelming show of force, no brandishing of weapons, no blocking of exits, no threat, no command, not even an authoritative tone of voice.' " *Drayton*, 536 U.S. at 204. Moreover, as in *Williams*, the officers had a reasonable, noncoercive explanation for all of their conduct (e.g., emergency lights as a caution to oncoming traffic; hand near the firearm as standard practice and on the firearm because of the machete). *See Williams*, 365 F.3d at 404–05. On top of all of that, "[t]here [was] nothing coercive about [Carter and Woodruff's] questions," and they "did not demand answers to their questions, leaving [defendant] free to decide whether to answer." *Williams*, 365 F.3d at 404–05. On the whole, Carter and Woodruff "by all accounts maintained a professional decorum." *Williams*, 365 F.3d at 404–05. Indeed, as the Government argues and as the video shows, Defendant was "so at ease

during the encounter" that he "truthfully answered Deputy Woodruff's question that he had a rifle concealed in his backpack," (Doc. 56 at 5), and Woodruff was so professional that he did not draw his firearm, even after the Defendant reached for his machete (Hr'g Tr., 94).

In sum, the Court finds that, based on the video, facts developed at the hearing, and the above case law, the encounter was consensual and not coercive. That is, under the totality of the circumstances, a reasonable person in Defendant's position would have felt like he was free to leave and like he could have terminated the encounter with the officers. For these reasons, Defendant's motion is denied.

### D.  Rejecting Defendant's Arguments

Defendant has pointed to a number of specific facts in support of his argument that the encounter was coercive. Defendant specifically points to: the activation of the officer's emergency lights, allegedly blocking the Defendant's path, the position of Woodruff's hand near or on his weapon, "aggressive" gestures, Woodruff's alleged order to stay here, the black search gloves, the warrant check, and Woodruff's alleged admission of detention.

The Court has looked closely at these issues and finds that, based on the totality of the circumstances, none of these, individually or combined, entitle Defendant to relief. Again, based on the totality of the circumstances, a reasonable person would feel like he could leave this encounter. The Court will look at each of these issues in turn.

### 1. Emergency Lights

The Court first rejects Defendant's reliance on the fact that some of the officers' emergency lights were activated. *Chesternut* did list the fact that the police did not "active[] a siren or flashers" as evidence that there was no seizure, *id.*, 486 U.S. at 575, but, in that case,

officers in a cruiser followed a defendant after he had run, *id.* at 569. The *Chesternut* court's full analysis is worth emphasizing:

> The record does not reflect that the police activated a siren or flashers; or that they commanded respondent to halt, or displayed any weapons; or that they operated the car in an aggressive manner to block respondent's course or otherwise control the direction or speed of his movement. While the very presence of a police car driving parallel to a running pedestrian could be somewhat intimidating, this kind of police presence does not, standing alone, constitute a seizure. Without more, the police conduct here—a brief acceleration to catch up with respondent, followed by a short drive alongside him—was not "so intimidating" that respondent could reasonably have believed that he was not free to disregard the police presence and go about his business. The police therefore were not required to have "a particularized and objective basis for suspecting [respondent] of criminal activity," in order to pursue him.

*Chesternut*, 486 U.S. at 575–76 (citations, alterations, and quotations omitted).

Putting aside the obvious fact that *Chesternut* found no seizure, this case is much different than the inference Defendant draws from *Chesternut*. Carter testified that, after he was flagged down by the motorist in the truck, the Defendant and his girlfriend were "coming up to my passenger-side window at that point in time. I rolled my window down, made contact with them." (Hr'g Tr., 9.) Thus, there is no evidence that Carter engaged in any sort of pursuit or that Defendant was fleeing. Nor did the officers "command[] [Defendant] to halt, or display[] any weapons, or . . . operate[] the[ir] car[s] in an aggressive manner . . . or otherwise control the direction or speed of [Defendant's] movement." *Chesternut*, 486 U.S. at 575–76. Thus, *Chesternut* does not support Defendant.

Defendant's other case, *United States v. Rodriguez*, 76 F. Supp. 2d 740 (W.D. Tx. 1999), is similarly distinguishable. There, the district court adopted the magistrate judge's recommendation that a defendant in a vehicle was seized under the Fourth Amendment when an officer, following three vehicles (one of which was defendant's), activated his lights to stop one

of the other cars, which ended up causing Defendant to pull to the side of the highway and stop. *Rodriguez*, 76 F. Supp. at 745–46. The district court found that, "when [the agent] activated his lights, a reasonable *motorist* in front of the marked Border Patrol unit, which had been following for 10–12 miles, could perceive this as an indication that [the] Agent . . . was ordering him to stop." *Id.* (emphasis added).

Again, this is factually different in that Carter and Woodruff had not followed Defendant for "10–12 miles" but rather came upon Defendant and activated their lights to alert oncoming traffic. A reasonable person in Defendant's position—who was on foot, not in a vehicle—would still feel free that he was able to leave.

### 2. Blocking Defendant's Path

Next, Defendant contends that the officers blocked his path with their vehicles in a coercive way. But this argument is unsupported legally and factually.

Legally, the Supreme Court has considered the fact that there was "no blocking of exits" in finding a consensual encounter, *see Drayton*, 536 U.S. at 204; however, Defendant provides no authority demonstrating that a reasonable person in his position would have felt himself blocked.

Defendant relies on *United States v. Alberty*, No. 14-7, 2014 WL 2159259 (N.D. Tex. May 23, 2014), but this case offers no such support. In *Alberty*, officers positioned their patrol car so as to block the entrance of a driveway where defendant's car was parked, and the defendant argued that this resulted in a detention. *Alberty*, 2014 WL 2159259, at *6. The district court ultimately held:

> [B]ased on the totality of the circumstances in this case, together with the reasonable inferences to be drawn therefrom, that Defendant's detention, and the subsequent warrantless search of his vehicle were lawful because, upon smelling a strong odor of marijuana smoke coming from his vehicle, the police officers had

reasonable suspicion to believe criminal activity was afoot and probable cause to believe contraband or evidence of a crime would be found in the vehicle.

*Alberty*, 2014 WL 2159259, at *8. As even Defendant acknowledges (Doc. 59 at 9), the *Alberty* court *assumed* that the officers detained Defendant by the position of their vehicle. *Alberty*, 2014 WL 2159259, at *6. But the Court never reached the issue or performed any sort of analysis. Without more, *Alberty* cannot support Defendant's position.

Defendant's argument is also weak factually. Carter parked his vehicle on the street, and Woodruff parked his vehicle behind Carter's, partly on the street and partly on the shoulder. (U.S. Ex. 1A.) It does not appear from the video that the officers angled their vehicles in such a way as to create a greater roadblock for the Defendant. (U.S. Ex. 1A.) But, even putting this aside, this is not even a situation as in *Alberty* where officers parked behind an individual's car on a narrow pathway such as a driveway. Rather, Defendant was walking on the open road, without a vehicle, and there was nothing to stop him from continuing in his path around Woodruff's car. That is, as in *Williams*, Defendant was "not subjected to a restrictive environment," *Williams*, 365 F.3d at 404, and a reasonable and innocent man in his position would feel he was free to leave.

### 3. Woodruff's Weapon

Moreover, the fact that Woodruff had his hand near his firearm (and on his firearm at one point) does not make the encounter coercive. In *Drayton*, the Supreme Court found that an officer's displaying of a badge and carrying concealed weapons during a bus interdiction was not coercive. *Drayton*, 536 U.S. at 204–05. The Supreme Court stated:

> And while neither [the officer questioning Defendants] nor his colleagues were in uniform or visibly armed, those factors should have little weight in the analysis. Officers are often required to wear uniforms and in many circumstances this is cause for assurance, not discomfort. Much the same can be said for wearing sidearms. That most law enforcement officers are armed is a fact well known to the

public. The presence of a holstered firearm thus is unlikely to contribute to the coerciveness of the encounter absent active brandishing of the weapon.

*Drayton*, 536 U.S. at 204–05.  To "brandish" means "to shake or wave (something, such as a weapon) menacingly", or "to exhibit in an ostentatious or aggressive manner" MERRIAM-WEBSTER'S DICTIONARY (2018), https://www.merriam-webster.com/dictionary/brandish .

Corporal Woodruff cannot possibly be described as "brandishing" his weapon by having his hand on it after the Defendant placed his own hand on his machete.  Rather, as in *Williams*, Woodruff "displayed no weapons[.]" *Id.*, 365 F.3d at 404–05.  Again, a reasonable person in Defendant's position would still feel as though he could terminate the encounter, and Defendant's subjective reaction of putting his hands in the air does not change that.  *See Mask*, 330 F.3d at 336 ("This 'reasonable person' standard is objective, and is concerned not with the citizen's subjective perception or the officers' subjective intent, but only with what the officers' words and actions would have conveyed to a reasonable and innocent person." (citing *Chesternut*, 486 U.S. at 574, 576 n. 7)).

### 4. Alleged Aggressive Gestures, Tone, and Orders to Stay

Similarly, the Court is not convinced that Woodruff made any "aggressive" gestures or issued any orders to stay in an authoritative tone.  Defendant focuses on the following still photo from the video and the fact that it caused Defendant and his girlfriend to raise their arms:



(Doc. 59 (citing U.S. Ex. 1A, 0:56).)

But the still and the alleged order have to be seen in context. As to the gesture, the Court has closely reviewed the video at regular speed (as opposed to a single still), and the Court finds that Woodruff's gesture, which lasted only a second or two as he was walking away, could hardly be considered "aggressive." (U.S. Ex. 1A, 0:56–1:00.)

As to the alleged order, there is no audio from this part of the video. However, Woodruff's tone throughout the rest of the video (where there is audio) is conversational and in no way coercive, so the Court can infer that Woodruff's tone at this moment is similarly not authoritative.

But, even putting this aside, Woodruff's account of what was said at this moment is critical. Woodruff testified that he "believe[d] he asked [Defendant]: 'Stay here. I'll be right back.'" (Hr'g Tr., 75.) He continued: "It's not ordering him to stay there. I said: Hey, if you could just stand right here, I'll be right back. . . . He's still free to leave at this point. I'm not ordering him to remain there. I'm just saying: 'Stay here. Don't run out into the street. Be right

back.' " (Hr'g Tr., 75.)[9]  The Court found Woodruff's testimony highly credible generally and in this moment in particular.  The Court thus agrees that Woodruff was not ordering Defendant to stay; he was asking him to do so momentarily while he went to his car.

In sum, the Court believes based on that testimony and the video that Woodruff's words to the Defendant at this point were not coercive such that a reasonable person would feel as though he could not terminate the encounter.  Again, Defendant's subjective reaction to Woodruff (i.e., raising his arms) is not controlling. *See, supra*.

### 5. The Search Gloves

The Court also disagrees about the significance Defendant places on Woodruff's search gloves. Defendant relies on *United States v. Monsivais*, 848 F.3d 353 (5th Cir. 2017), where the Fifth Circuit stated that it was "undisputed" that an officer "effectively seized" the defendant when the officer "announced that he was going to pat him down." *Monsivais*, 848 F.3d at 358. The Fifth Circuit found that the deputy "thereby clearly asserted his authority as a peace officer to seize [defendant] so that any reasonable person in [defendant's] position would have known that he had been detained at that moment and was no longer free to walk away." *Monsivais*, 848

---

[9] Woodruff further testified:

Q:       So stay here.  That means you're not free to leave, right?

A:       No. He's still free to go. He's still not being detained for any crime. . . . He has not asked me to leave yet. He has not asked me: Am I under arrest? Am I being detained? Am I free to leave? He did not make any of those comments, no.

Q:       So he has to ask you permission to leave?

A:       If he wants to leave.

Q:       So if he wants to leave, he needs your permission?

A:       If he wants to leave he can go.  But he never indicated to me that he wanted to go.

(Hr'g Tr., 76.)

F.3d at 358 (citations omitted). "In doing so, [the] Deputy . . . converted the officers' roadside assistance or 'welfare check' into an investigatory stop or detention" of defendant. *Monsivais*, 848 F.3d at 358. The Government even "agree[d] that [the] Deputy[']s . . . seizure and frisk of [defendant] commenced when [the officer] announced that he was going to pat [defendant] down." *Monsivais*, 848 F.3d at 358.

Putting aside the fact that the Government has not conceded this point, the instant case is materially different from *Monsivais*. Woodruff did not ostentatiously put on his gloves in front of Defendant as though to announce that he was going to be searched. Rather, Woodruff put his searching gloves on in his car and then exited the vehicle; when Woodruff is shown on video, he is not drawing attention to the gloves. (U.S. Ex. 1A; Hr'g Tr., 82.) Further, upon his exiting the vehicle, Woodruff did not announce that he was going to search the Defendant at all; he simply asked the Defendant if he had any guns. (U.S. Ex. 1A, 4:56–5:00.)

The Court simply disagrees with Defendant that putting on gloves "materially altered" the nature of the encounter or somehow is the same as verbally announcing to an individual that he is going to be patted down. In all likelihood, an officer wearing gloves announces little to a citizen, and certainly would not signify to an individual that he is not free to leave. For these reasons, the Court rejects Defendant's argument.

### 6. The Warrant Check

The Court also rejects Defendant's argument that the officers detained him because they performed a warrant check. The Court finds Defendant's reliance on *Brown v. Texas*, 443 U.S. 47, 99 S. Ct. 2637, 61 L. Ed. 2d 357 (1979), misplaced.

In *Brown*, the Supreme Court reversed the conviction of a man who "refused to comply with a policeman's demand that he identify himself pursuant to a provision of the Texas Penal

Code which makes it a crime to refuse such identification on request." *Brown*, 443 U.S. at 48. The high court stated: "When the officers detained appellant for the purpose of requiring him to identify himself, they performed a seizure of his person subject to the requirements of the Fourth Amendment." *Brown*, 443 U.S. at 50. "Whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person, and the Fourth Amendment requires that the seizure be 'reasonable.' " *Brown*, 443 U.S. at 50.

But there is a key distinguishing fact in *Brown*; there, the defendant "refused to identify himself and angrily asserted that the officers had no right to stop him," yet he was arrested anyway. *Brown*, 443 U.S. at 49. As Justice Stewart said of *Brown*, "Up to this point there was no seizure. But after continuing to protest the officers' power to interrogate him, Brown was first frisked, and then arrested for violation of a state statute making it" a crime to refuse to give one's name and address "to an officer 'who was lawfully stopped him and requested the information.' " *Mendenhall*, 446 U.S. at 556 (Opinion of Stewart, J.). "The Court simply held in that case that because the officers had no reason to suspect Brown of wrongdoing, there was no basis for detaining him, and therefore no permissible foundation for applying the state statute in the circumstances there presented." *Mendenhall*, 446 U.S. at 556 (Opinion of Stewart, J.) (citing *Brown*, *supra*).

The Court agrees with Justice Stewart's reasoning. Here, Defendant did not refuse to identify himself but was nevertheless held. Rather, Defendant freely gave his identification to the officers and then voluntarily choose to wait with Carter while Woodruff conducted the warrant check. A reasonable person in Defendant's position would still feel free to leave. Thus, *Brown* does not demonstrate that the Defendant is entitled to relief.

## 7. Woodruff's Alleged Admission

Defendant's reliance on Woodruff's alleged admissions at the hearing that Defendant was detained is similarly unavailing. Preliminarily, the Court notes that Woodruff provided other testimony that indicated that he had not detained the Defendant.[10] Further, both officers stated numerous times throughout the hearing that the encounter was consensual and that Defendant was free to leave. (*See* Hr'g Tr., 13, 14, 16, 27, 32, 33–34, 49, 50, 71, 76, 79.); *Cf. Royer*, 460 U.S. at 503 (finding no consensual encounter when "the State conceded in the Florida courts that Royer would not have been free to leave the interrogation room had he asked to do so."). For example, Woodruff was specifically asked, "Once they gave it to you, they can't leave while you do a warrant check, though, right?", and he responded, "They're still free to go. This whole time, they're free to go." (Hr'g Tr., 79.) Based on all of this, the Court finds that Woodruff did not admit that he detained Defendant.

But, even putting this aside, the Supreme Court has noted: "Of course, the subjective intent of the officers is relevant to an assessment of the Fourth Amendment implications of police conduct only to the extent that that intent has been conveyed to the person confronted." *Chesternut*, 486 U.S. at 575 n. 7 (citing *Mendenhall*, 446 U.S. at 554 n. 6 (Opinion of Stewart, J.) ("We agree with the District Court that the subjective intention of the DEA agent in this case to

---

[10] Specifically, Woodruff testified:

> Q:     You said "Let them go," were they detained prior to this –
>
> A:     I'm saying let them go as: Here's your information back. Have a nice day.
>
> Q:     But you intended to terminate your encounter?
>
> A:     Correct.

(Hr'g Tr., 52.)

detain the respondent, had she attempted to leave, is irrelevant except insofar as that may have been conveyed to the respondent.")); *see also Mask*, 330 F.3d at 336 ("This 'reasonable person' standard is objective, and is concerned not with the citizen's subjective perception or the officers' subjective intent, but only with what the officers' words and actions would have conveyed to a reasonable and innocent person." (citing *Chesternut*, 486 U.S. at 575 n. 7)). Thus, even if Woodruff subjectively believed that Defendant was detained (which is questionable), this belief is ultimately irrelevant because there is no evidence that Woodruff conveyed this information to the Defendant.

*Mask* illustrates this. There, the Fifth Circuit found that the district court erred to the extent that it determined that the defendant's seizure was affected by the officer's arrival on the scene "with the intention to 'detain these guys' and investigate [a] hunch," as the "officers' objective conduct, not their subjective intentions or private conversations, is relevant to the seizure determination." *Mask*, 330 F.3d at 337 (citing *Chesternut*, 486 U.S. at 575 n. 7). Thus, *Mask* concluded that the district court should have limited its consideration to the evidence of "officer conduct and speech that was visible or audible to [defendant.]" *Mask*, 330 F.3d at 337.

Similar reasoning applies here. Even assuming that Woodruff subjectively believed that Defendant was detained (a conclusion which the Court rejects based on the video and his testimony as a whole), this fact would not convert the consensual encounter to a detention because Woodruff did nothing to convey that sentiment to Defendant. For this additional reason, Defendant's motion lacks merit.

### E. Summary

Having looked at the Supreme Court and Fifth Circuit precedent discussed above and the totality of the circumstances of this case, it is clear that "a reasonable person in the circumstances

described would [have felt] free to disregard the officers and proceed with his or her own business." *Williams*, 365 F.3d at 404 (citation omitted). Though Defendant raises a number of issues, the Court finds that none of these, individually or in combination, changes its conclusion. Consequently, for all the above reasons, the encounter was consensual, and none of the evidence seized after Defendant made his incriminating statement should be suppressed.

## IV. Conclusion

Accordingly,

**IT IS ORDERED** that *Defendant's Motion to Suppress* (Doc. 19) filed by Macon Carroll is **DENIED**.

Signed in Baton Rouge, Louisiana, on <u>December 13, 2018</u>.

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**